Next case up is Robbins v. Robertson, Mrs. Sternleib. Ms. Sternleib, I'm sorry, MS, period. Good morning, Your Honors. May it please the Court. Sarah Sternleib for the Plaintiff Appellant Marquise Robbins. Mr. Robbins filed a handwritten pro se complaint alleging that Valdosta State Prison served him vegan meals that were under-portioned, inedible, and often included non-vegan foods. They were contaminated with items prohibited by his religious beliefs. He alleged he lost weight, he had throbbing headaches, and suffered other effects of malnutrition, which necessitated treatment by the medical unit. This went on for three months straight, and although the quality of the meals improved for a brief period of time, the food soon reverted back to the earlier insufficient conditions. He also got vitamins for a period, didn't he? He — after he went to the medical unit and they gave him a blood test, they determined that he needed treatment, and he was given not only a multivitamin, but he was also prescribed a supplemental medical meal, which was in addition to the food that he was receiving normally. Right. The district court overlooked the underlying facts and instead focused solely on the legalese peppered throughout Mr. Robbins' handwritten complaint. My understanding is that, and maybe I'm wrong about this, but the district court wasn't so much denying that he had a right under the First Amendment to this kind of meal, but simply that under a Twombly sort of approach that he just had conclusory labels and things to suggest, you know, stringy food, unwholesome, unbalanced, the kind of thing any prisoner could come back and probably say about their food, and it wasn't enough. Tell me what you think in his complaint was specific enough that it would get us past those Twombly concerns. Well, I think that, Your Honor, there were a couple of facts, and I agree that you're right, that the district court was not alleging that he was not entitled to a religious dietary accommodation. But he alleged a number of facts throughout his complaint. He alleged that from April 8th until April or until January 8th until April 8th, and then again after June 2015, the meals that VSP provided were, and I quote, meager, improperly prepared, and at times inedible. He alleged that the food was diluted and stretched, which reduced the nutritional content, and that the meals did not provide the requisite amount of calories or protein. He also alleged that on some — Isn't the bottom line fact that they were contaminated? Excuse me, Your Honor? Isn't the fact that they were contaminated the strongest point you have? I think that that's another point that makes — Well, that's what meant he couldn't eat them. Well, I think there are two separate facts. There's the facts that go to the — that the food that he was provided that was vegan was inadequate. And there are the facts about contamination, which meant that the food that he was provided was — That's what puts him to the choice. Excuse me? Puts him to the choice. He isn't put to a First Amendment choice over the fact that maybe the portions aren't quite large enough or he isn't getting enough to feel well, right? I believe that he is put to a First Amendment and RELUPA choice based on the fact that he isn't given enough food to sustain his nutrition. I think the fact that he's also forced to either violate his religion by eating contaminated food or to not eat it and therefore go hungry is another reason why it's a substantial burden. But the — How specific is your — what you're really arguing is an allegation that my food did not contain adequate nutritional value to sustain a person. Is a specific enough allegation for him to go forward? I think it was not just that it was inadequate. It was the facts that I just — that I just stated before. We also have to consider that on Saturdays, the meals that he received was simply five peanut butter and jelly sandwiches. And they usually contained jelly, which he could not eat because it contained pork ingredients. I gather if they had just given him peanut butter, that would have been fine. It was the jelly that was the problem. Yes. It had gelatin. Yeah. I agree. And that — the allegation is that that's every Saturday from January straight through. That doesn't change during the time that he's on the medical diet. He did not — he did not specify whether that changed during the time that he was on the medical diet. But on the medical diet — Well, if I'm construing the complaint most favorably to him as I'm required to, do I assume that the Saturday problem was throughout? I agree. And I would also point out that — That means — that means on one day of the week he's making the choice and getting any food because of his free exercise. You're right. And that's a problem. But I would also point out — A problem? Why isn't that enough on its own? I would believe that it is enough on its own. But the fact is that we look at the complaint as a whole, and we have significantly more than that. And just to clarify about the medical meals that he was provided, for more than two out of the three months that it was prescribed, it included meat in it and milk, such that the only thing he could eat out of that diet meant to supplement his current nutrition was an apple or an orange. Does his complaint indicate that pursuant to his Muslim belief, he had to have a vegan meal? That is, he couldn't eat eggs or milk — or drink milk? So what he — what he alleged was his beliefs was that he was not — that he is prohibited from consuming meat or any animal products or byproducts, which would include eggs and cheese, without sufficient knowledge of how the food product was prepared. And that's per his religious beliefs, that any contact with food that was not vegan, i.e. not coming from an animal, would be an immediate contamination. And there are multiple courts of appeals that have recognized this concern with contamination in inmates that are trying to keep a halal or vegan diet. The vegan diets are given to prisoners as a cost-effective way so that the prisons don't have to buy kosher and halal meat. It's just an easier way to ensure that they're not being given food that would violate their religion. Well, it's your strongest argument that a lot of these things do seem vague and they seem like the nutritional value is something specific to him, but the general unwholesome and contaminated is probably going to be something any inmate can talk about. Is not your strongest argument that he has some corroboration through the fact he goes to the medical unit and he is determined to be malnourished? Yes, I agree. And I think that even if those allegations are more vague, we know exactly what happened here, that he — that it caused him to lose 15 pounds, that he experienced throbbing headaches, weakness, and other health effects, and that he was not only seen — What caused it? Was it him not eating or was him eating food that wasn't sufficiently nutritional? The way I read it is that he's not — is that he wasn't eating enough food, and I think that's either enough food that he — No, he was eating contaminated food. He does not specifically allege whether he was eating contaminated food or not. How can we even get a hold of this case if we don't know what he was doing? Well, I think, first off, if you're concerned about that, it can be remanded for him to file a more specific amended complaint, which the court has held is the proper thing to do. He's had two chances. Excuse me? He's had two chances. He's got his original complaint and he's had one amendment. Even when a prisoner has been — has amended a case as of right, this court has held that a more carefully drafted complaint could state a claim, and the district court should give them the opportunity to remand, because it's really the semantics. But whether he ate contaminated food or didn't eat it is — itself would be problematic. A substantial burden talks about the choice, and it's — the contamination issue is a fear of contamination. If he ate it, then that would violate his religion. If he didn't eat it, then he would go hungry and he would be denied a benefit, which is exactly what the First Amendment and RELUPA prohibits. So we're unclear from the complaint whether he was losing weight because he said, uh, I'm not going to eat this, picky eater, I'm not going to eat this, or if he's losing weight because he was trying to eat it sometimes and it just didn't have enough calories or protein for him. We're not clear which he's alleging. Yes. But my argument is that that's a substantial burden either way, that it would be because he's violating his religion or that he's not. It would also be a substantial burden if, from time to time, he, on days when he was hungrier, he ate food that he thought was contaminated and violated his religion, or on days when he was feeling more wholesome that he didn't eat the food and that he was denied a benefit. That first, if you covered, would not violate the Eighth Amendment. Which would — excuse me? If he was hungry and ate the food, regardless of it violating his religious beliefs, that would not violate the Eighth Amendment if he got the nutritional sustenance from eating the food. Your Honor, I think that's a question that is more open. I personally would argue that that would be an Eighth Amendment violation, but we don't have that issue there. How could it be cruel and unusual punishment physically inflicted, which is all that the Eighth Amendment has ever been interpreted to cover, physical infliction of pain and suffering? How would it be that if he ate the food and it was an adequate diet, nutritionally? Eighth Amendment. Well, here, let's say he did eat the food here. He lost weight. That is what you said. Yeah. I think that that's a separate question that's not at issue because we know that he experienced direct health effects from this, that the food was — I don't understand then why you were discussing that possibility. Of whether he — You said, let's assume that he ate, that he, in spite of his religious objections, ate the food. I think that even if he ate the food, it shows that the food he was given was not enough. Okay. So — And so that would be an inadequate diet, which would be a violation both of the Eighth Amendment and the First Amendment. Okay. If he ate the food but it wasn't adequate and it was sufficiently inadequate that it violated the Eighth Amendment, it would still violate the Eighth Amendment. Yes. We understand that. Yes. Okay. Proceed. My remaining time, if I could turn to the question of mootness about the Rallupa claim. I believe that the controlling law in this circuit holds that absent defendant's counsel advisement that the appellant wouldn't be returned to the subject prison, the same alleged conduct could occur and the issue would not be moot. The defendants here have not assured that. And, in fact, Mr. Robbins has already been transferred back to VSP once. Just as in this Court's cases in Lemcool and in Dacre, where the plaintiffs not only were subject to transfer back, but they had, in fact, been transferred, that this Court should at least remand and allow the district court to examine the issue. Let me ask you this as to whether the mootness issue really matters. If you prevail on your Eighth Amendment claim, he's entitled to damages, right? Correct. And that will be in a decision which is binding on the DOC in the future, at least as it involves this inmate, will it not? I would believe so. So he will get the relief that he would get on the Rallupa claim, will he not? Well, the first step for the First Amendment and Rallupa are the same. And if you're talking about whether he succeeds on the First Amendment, it's the district court did not reach. There's a different burden for the defendants to prove, which is a higher burden under Rallupa, which is why I think it would make a difference if that claim was also kept live. Yeah, but if he gets the relief on the Eighth Amendment claim . . . You mean First Amendment? I'm sorry. If he gets the relief on the constitutional claim, let's keep it at that level of generality, that will prohibit the Department of Corrections from repeating the harm to him in the future, will it not? They will be bound not to do so by the judgment, will they not? I can see my time is up, but if I could just answer Chief Judge Kearns' question. I agree that you are correct there. However, first we have to win on that claim, not just be remanded back to the district court. I understand, but you said Rallupa is a higher burden. It is. So if you are going to win on the Rallupa, you are going to win on the constitutional claim. That is accurate. All right. So put Rallupa aside. If you win on the constitutional claim, you have a judgment which binds these defendants and their successors in office not to do this again because if they do, they will be paying more damages. So why do you need a statutory claim that has a higher burden that will result in the same effect, i.e., injunction to prevent them from doing it in the future? You get an implicit injunction with a judgment against them for money damages because they are not going to continue paying him money damages over the time horizon. So I don't understand why that is not practical mootness. It doesn't matter. The Rallupa claim doesn't matter. And if you lose the constitutional claims, you are going to lose the Rallupa claim. I think it is actually backwards. The defendants have a higher burden to prove the Rallupa claim, not the First Amendment claim. Defendants don't have to prove claims. The defendants have a higher burden to show that there is a under Rallupa, they would have to show that there is a compelling government interest that's the least restrictive means. And under the First Amendment, they would have to show just that it's a legitimate penological interest. Okay. I misunderstood your statement. I apologize. Thank you, Your Honor. Thank you. Ms. Gore. Good morning. May it please the Court. Debra Gore for the defendants in Appalese. Marty Allen and William Robertson. I'd like to start briefly with the mootness issue and address what counsel has said with regard to I think what was characterized as binding authority on this court. I think what I'd first like to point out is the general rule in this circuit, which has been the general rule for decades now, and that is that a transfer of an inmate from one institution or out of custody moots a claim when that claim involves allegations of conditions of confinement at the original institution. That's what we have here. Unless there is an institution-wide policy. That's correct, Your Honor. Unless there is an institution-wide policy, because in that case, no matter what institution the inmate is being held at, the policy will affect him. So the court can grant adequate relief to that inmate. We don't have that here. We have a situation where Mr. Robbins was transferred in 2016 out of VSP, and we have a situation where his allegations are very specific to Valdosta State Prison. He's no longer there. So the result is the court really can't grant him any effective injunctive relief by directing individuals at Valdosta State Prison to take certain acts. That's what this court has long held, and that's what the court should find here. The claim is moot. Now, I want to briefly address Hardwick, because I know that's what the appellants rely on, but Hardwick is not and should not be controlling here. Hardwick, which is a 1975 Fifth Circuit case, is distinguishable. But before I mention that, I want to mention that it is a 1975 case, and although adopted as precedent in this court, there are countless Eleventh Circuit cases since that time that have continued to apply the general rule of mootness, transfer results and mootness in the situations that I just mentioned. So there's that, but there's also subsequent Eleventh Circuit rulings that point out why Hardwick is distinguishable. In McKinnon v. Talladega County, it was a situation of a transfer and an allegation of mootness in an attempt to apply Hardwick by the appellant to say, well, it's not moot because of Hardwick. And this court pointed out that the Hardwick decision is unique. In that case, the plaintiff had brought three cases in three different county — I'm sorry, in the three different district courts, and the court was looking for a way to consolidate them into one. And perhaps more importantly, that was a challenge to the legal mail system, system-wide. So it's not controlling here. This court has not applied it the way that the appellant asked that it be applied, and quite frankly, even the Fifth Circuit since that time has not done that. Instead, it has applied the same rule that the Eleventh Circuit has applied. So I think that the law is pretty clear in this case. Mootness applies. And as far as the Dacre ruling that was referenced, again, this court even specifically mentioned, under the particular circumstances of Dacre, we will remand for factual findings on mootness. Those circumstances don't apply here. The record in that case had evidence of transfers back to the institution at issue. Who's the burden on the transfer back issue? The burden is on the appellant. The burden is on the appellant because this court has said that repeatedly, and not only this court, but the Supreme Court has said that repeatedly. In defining what we're talking about here is whether or not the exception to the mootness doctrine applies and that it's capable of repetition. And what Weinstein v. Bradford, a United States Supreme Court, said is that that applies not only in narrow circumstances, but only when there's a reasonable expectation the same complaining party will be subject to the same action. And followed up by the Lions, L.A. v. Lions, where the United States Supreme Court said the doctrine applies only where the named plaintiff can make a reasonable showing that he will again be subject. Hardwick said unless the defendants guarantee that the prisoner will not be returned to the prison where his rights were violated. I agree that it says that, Your Honor. That is correct. But again, because that has not been applied in that manner. It doesn't matter how it's been applied. It's prior panel precedent. And in addition to that, and again, I do acknowledge it's 1975 Fifth Circuit, so it does constitute precedent. It hasn't been applied that way, but in addition, as I mentioned, that involved a situation of a challenge to a legal mail system that was system wide. Yeah, but it's talking about transfer to another prison. Does transfer to another prison moot it? And they said only if the defendants guarantee he won't be transferred back. Yes. Yes, Your Honor. That's correct. I would like to point, though, to more recent cases of this court. For example, Spears v. Thigpen, 1998 Eleventh Circuit Court. There was a transfer within the same prison system. I believe that was the Alabama Department of Corrections system. That transfer was within the system, and this court did not require or even mention any requirement that the defendant make assurances of a non-transfer. It applied the general rule of this circuit and found that the transfer mooted the injunctive relief claim, even though it was within the same system. And this court even more recently, as recently as last month in April, in rulings involving mootness, potential mootness, transfers within the same prison system, has not looked to the defendant to make assurances. And I think finally in that point I'd note also the defendant, this is not a case against the Department of Corrections. This is a case where the plaintiff has sued two individuals who happen to no longer work at the Department of Corrections with respect to one and the other who is on leave, but not at Valdosta. It's not targeted at the Georgia Department of Corrections, nor could they have any capability of making any assurances about where someone is transferred. They just simply don't have that authority. So I think that is another way in which this case is just not ripe for applicability. Are you arguing that a judgment here in favor of Mr. Robbins wouldn't have any binding effect on the institution? The next man, when Mr. Robertson is gone and the next person who's in there, assume Robertson loses here and has to pay some money and has a risk of contempt in a future event, as the Chief Judge was talking about. Are you saying to me that the institution is scot-free? No, I'm not saying that, Your Honor. Certainly a new warden would be substituted in if you're talking about injunctive relief in an official capacity. What I'm saying is that in this case, to the extent appellants asking for assurances, they haven't sued the Department of Corrections, and there is nothing in the record, and I don't believe it exists, any authority for a warden to be making assurances as to where an inmate can and cannot be transferred. The defendants in this case simply can't do that. And more importantly, this Court has not required them to do that. With the exception of the Hardwick case, they haven't required them to do that in almost identical circumstances. If I might, I'd like to go on and speak a little bit to the substantial burden First Amendment and RILUPA underlying claims should it not be found moot. What I found interesting about your brief, ma'am, is on the First Amendment issue, we have three months in which, and possibly a month in June, in which there's an allegation that the food was contaminated to such an extent that he's put to this choice under his religion. So you have contamination that I don't believe you address at all in your brief. And I'm being generous when I say you walk away from Saturdays. So why isn't there a sufficiently pled First Amendment claim here when someone comes in and says for four and a half, three and a half, or perhaps four months, with all of my meals, every day I'm getting contaminated food and I'm getting nothing on Saturdays? I think, Your Honor, because he doesn't act — when you look at all of the allegations — Why didn't you address the contamination? I believe in our brief we argued that he hasn't alleged that he has been unable to eat any meal due to contamination, and he hasn't specifically alleged that his burden is a result of — Well, that goes to whether or not he did or didn't eat them. His argument is that when I'm being put to the choice, when they slide the tray, the contaminated tray, through the slot, I take one look at it every day for four months, and I say, if I eat this, I'm not going to the promised land, and I'm going to starve to death. I don't really have any choice. And I'm on that Hobson's — his cause and Hobson's choice. Are you saying that he doesn't have a First Amendment right at all unless he says he actually ate it? No, I'm not saying that, Your Honor. But I would respectfully disagree that he has pled what you have just so artfully stated in your question. Well, now, aren't — he's not required to be as artful as I am. That's true. He's not. And I'm not holding him to that or asking the court to hold him to that standard. But as far as the contamination, I think it's very important to look at the entire complaint and look at what he has said and not said. Now, he does say that the trays are placed next to non-vegan trays and that he — that he says that — The fact that they weren't wrapped is the key problem. Right. For the first four months, they're totally unwrapped. They come down from the tray and with the other stuff. Every tenet of his religion is violated right away. He does say that — And then he has a problem on Saturdays when they come and they say, well, here — you know, here — here — this is a — you know, Saturday's a long day. And he gets, what, two peanut butter sandwiches for breakfast and three for lunch is the idea. That's what he says. And you have to take that as true. And he can't eat any of them. Again, I — Your Honor — It's just contaminated again, right? I do — again, I respectfully disagree that he has said that I cannot eat anything on Saturdays. What he has said — What did he say about Saturday? He said the sandwiches are consistently blended with jelly. He does state that his religion — And the jelly makes it contaminated. Well, he says that — he states that his religion — his religious beliefs require him to refrain from jelly without knowledge as to whether it includes pork or ingredients, other meat ingredients, where he doesn't know whether — how the animal has been slain. He indicates that gelatin — jelly usually contains gelatin, and gelatin is usually extracted from pork ingredients. What he's alleging, Your Honor, is that — I'm on the vegan meal plan. I saw that they put jelly — Is that just wildly preposterous? It's not wildly — You can't — you can't get rid of the allegation on the wildly preposterous ground? No, but, Your Honor, I would say that — that he has made it clear in other parts of his complaint when there is a food item he cannot eat. That's what I wonder in the first place, is whether I ought to be listening to you on this at all, because you made no argument in your brief whatsoever about Saturdays. You said, oh, my goodness, with the exception of Saturdays, everything was fine. That's what your brief said. Well, I believe, Your Honor, we did address the Saturdays and his allegation of the Saturday meals, and that overall, when you look at his — You didn't challenge the question of whether or not the jelly was contaminated. I don't know that we discussed in detail whether the jelly was contaminated. Well, then we have to accept as granted that he's saying the truth. Well, I — For purposes of the pleading. But he doesn't say the jelly — this jelly was contaminated. He essentially says, I don't know, and I haven't been told. He doesn't — Well, that's the same nature of the problem when they give him the tray, the food that they put to him. He couldn't be certain that what they slid under the door was contaminated, but he knew it hadn't been protected. Yes, Your Honor. He does say those things, but he also states that the choice I was put to was not between violating my religious beliefs because I had to consume contaminated food and some other thing. He specifically alleges over and over, the choice I was put to was starvation and malnutrition or eat a non-vegan meal. That's how he has pled his complaint. And although he does discuss contamination — You're saying he's not alleging that he had to make a choice based on religion? He does say he had to make a choice based on religion. Isn't that enough? It isn't enough because, in this case, the choice he talks about is a choice between malnutrition and starvation and not eating a vegan meal. But when we look at everything, and we have to look at everything in his complaint, we can't just look at certain select facts. He does allege a lot. But what he alleges, and I'm — He honestly alleges that come his complaints worked, and for three months after April, they changed. Yes, but he also alleges that — he alleges something that's simply not plausible, which is I was either completely unable to eat any of these meals, or I ate them, but they were so meager, diluted, and insufficient that I am placed to a substantial — He doesn't exactly say those words you just said, right? You're characterizing it. I'm characterizing it. Yes, thank you. Yes, I — And that's not really fair, is it? Well, I think for purpose of the argument, I'm just trying to boil it down to — I know that, but that's not the argument. What we're talking about is whether or not he pled a complaint that would stand up under Twombly. And I — and our position is that it wouldn't stand up under Twombly because it has to be a plausible claim. And what's not plausible is that he either didn't eat or ate such meager food for a three-month period of time, and then when it's a — No, he was put to a choice. His claim is that he was put to a choice to eat because he was served up with food that he had reasonably was contaminated. Yes. I see I've run out of time. May I answer your question, Your Honor? Yes, and the one before it as well. Okay. If I can recall what that was. He — our position is that he has argued something that's implausible. And there is a plausibility requirement for pleading, even at the motion-to-dismiss stage. What he's pled is that the meals were so meager that I suffered physical injury. And he does plead physical injury. Of course he does. But we also know that he spent three months on this diet is seen by what he calls — he terms to be a qualified physician or a proper physician, I think is the term he used. And that proper physician evaluated him and said, right at this point in your evaluation, I'm prescribing you a multivitamin. Our position is that it's simply not plausible to be — taking in the type of meals that Mr. Robbins described, which are general descriptions, so we have to look to these more specific facts. What does it mean diluted? What does it mean not nutritionally adequate? Well, let's look. What we know that he was — Well, you're — the way you're constructing your argument, you're jumping from one to the other. It's simply implausible that. That he was on a diet so inadequate in nutrition, and yet after three months on this diet, a proper physician, as he terms it, evaluates him and prescribes a mere multivitamin. And it's implausible that that type of — for that same reason, it's implausible that he was facing substantial pressure. And an enhanced diet, a medical diet. After two weeks later, he was placed on that. But we do know that that was — that was the message to come down to the kitchen. To improve — to — I'm sorry. I think you said — So you're saying basically all he got was he can't be very sick because they just gave him a multivitamin. We are saying that, Your Honor. Yes, I am saying that. And were the blood tests back at the time they gave the multivitamin? The blood test wasn't back. And when the blood test was back, he was given the supplemental meal, which we know is a sandwich and fruit. And our position is that his — that it is just — A sandwich he couldn't eat. He could not eat the sandwich. But, again, at that time, it was also a time when the meals hadn't proved. Thank you, counsel. Thank you. Mr. Sterling. Three minutes. Your Honors, the Supreme Court in Erickson, while it was considering Iqbal, specifically said that specific facts are not necessary. All that the defendant has to do is give fair — all that the plaintiff has to do is give the defendant fair notice of what the claim is and the grounds for which it rests.  but the plaintiff does not. Mr. Robbins alleged and what his problems are. It's clearly plausible. The defendants are effectively arguing that because he hasn't died already or he doesn't — he's not knocking at the courthouse doors, that his claims are not plausible. But we're looking at what he alleged in the complaint, and that on itself, with the multiple facts that he alleged were sufficient. He alleged that — that the vegan meals were under-portioned, they provide insufficient calories and protein. On Saturdays, he was served entirely non-vegan foods. He was given a medical meal diet after it was determined that his nutrition was suffering and that the medical meal diet itself was not vegan, and that the food was so inadequate that he lost over 15 pounds in a short period of time and experienced other effects. After he was seen by the medical diet, they were — after he was seen at the medical unit, they were entirely unsurprised at his condition and called it the Marty Allen diet. While — and while he resides at the one other prison offering his necessary conditions of confinement, he may and already has before been transferred back to VSP. This is enough to overcome a motion to dismiss. If I may turn to defendants' arguments on the mootness issue. Transfer to a — the cases that defendants have cited, including the Spears case that they just referred to, were cases where the transfer was — was — where the — where the — where the plaintiff changed status. So in Spears, he was in admin — he was in administrative segregation, and it doesn't say that he was transferred in the same system. And in all the other cases that they cited, these were transfers where the prisoner was released, where they were just transferred from county prison to state or federal prison, where there's no actual likelihood that he may go back to the one place that Mr. Robbins can go back to. In Dacre, they transferred because, exactly as we have here, the — the plaintiff was already transferred back to the subject prison. I thought there were three prisons in the state that gave vegan diets. That is what the defendants argue. However, based on what — Is that — is that right or not? If we look at the document that they actually cited, they don't even — the document doesn't even say that VSP or Hayes State, where Mr. Robbins currently is, offers a vegan diet, which, presumably, they do. So I would have to question that and ask for more facts. Yeah, but if it's underinclusive, that doesn't help you. The list. If it's — You're saying that it — we should disregard the list because it doesn't include the institution he is now at, which should be included as one that offers the vegan diet. Well, I think we — That doesn't help you. If it's overinclusive, if there's one in there that doesn't offer it, then that's a grounds for questioning the accuracy of the others that are included in the list. You're right that it may be underinclusive, but the other issue is that Mr. Robbins has to be in close security in a one-man protective cell unit. And from what he has stated, that the only two prisons that offer that, along with a vegan diet, is VSP and HSP. Yeah, one of which is okay, the other which is not, right? He also alleges that he's experiencing similar issues in HSP, which is why this case is actually much more like Hardwick, and why I think these cases are alive and need to be remanded. Thank you, Your Honor. I understand. Thank you, counsel. We'll take that case under submission and stand in recess. All rise.